**In the United States District Court**
**for the District of Kansas**

---

**In re: CCA Recordings 2255 Litigation**,
                              **Petitioners,**

**v.**                                                    **Case No. 19-cv-2491-JAR-JPO**

                                                          **(This Document Relates to Case No. 14-**
                                                          **cr-40130-DDC-1,** *United States v. Tomasa*
                                                          *Camargo-Simental*, **and Case No. 18-cv-**
                                                          **4122-JAR-JPO,** *Tomasa Camargo-*
                                                          *Simental v. United States*)

**United States of America.**
                              **Respondent.**

---

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Tomasa Camargo-Simental's Motion to

Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 43).[1]  Petitioner alleges the

government violated the Sixth Amendment by intentionally and unjustifiably becoming privy to

her attorney-client communications.  Because she has completed both her sentence of

imprisonment and her term of supervised release, she asks the Court to dismiss the case with

prejudice to refiling.  The government has responded and opposes the motion on multiple

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in the underlying criminal case, Case No. 14-40130-DDC-1.  Citations prefaced with "*CCA Rec. Lit.*, Doc." refer to filings and entries in this consolidated case, Case No. 19-2491-JAR-JPO.  With the exception of *United States v. Carter*, Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in Case No. 16-20032-JAR are prefaced with "*Black*, Doc."

grounds, including threshold jurisdictional issues.[2]  For the reasons explained in detail below, Camargo-Simental's challenge to her conviction is dismissed for lack of standing.

## I.      Background

### A.      Procedural History

The October 22, 2014 indictment charged Camargo-Simental with conspiracy to possess with intent to distribute methamphetamine and two counts of using a communication facility in the course of a drug distribution conspiracy.[3]  Tom Telthorst was appointed to represent Petitioner on October 28, 2014, and Magistrate Judge K. Gary Sebelius entered a detention order on November 4, 2014.[4]

On June 1, 2015, Judge Sebelius accepted Camargo-Simental's guilty plea to the communication facility charges, pursuant to a written plea agreement.[5]  On May 23, 2016, Judge Daniel D. Crabtree sentenced Camargo-Simental to 57 months' imprisonment followed by one-year term of supervised release.[6]  The Court dismissed the conspiracy count upon entering judgment.[7]

The Court appointed the Federal Public Defender ("FPD") to represent Camargo-Simental in her § 2255 proceedings on July 17, 2018.[8]  On September 11, 2018, the FPD filed a motion pursuant to 28 U.S.C. § 2255 on Camargo-Simental's behalf, setting forth a single

---

[2] *Camargo-Simental v. United States*, No. 18-4122-JAR-JPO, Docs. 3, 5, 7.

, Docs. 6, 7, 8.

[3] Doc. 1.

[4] Docs, 8, 12

[5] Docs. 21, 24.

[6] Doc. 39.

[7] *Id.*

[8] Standing Order 18-3.

ground for relief: the government violated the Sixth Amendment by intentionally and unjustifiably intruding into her attorney-client communications.[9]  The government responded to the motion and Camargo-Simental replied.[10]  Camargo-Simental's custodial sentence ended on December 19, 2018.[11]  Camargo-Simental was deported from the United States after completing her sentence.

### B.    The *Black* Investigation and Order

The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black* Order") that precipitates the § 2255 motions before the Court.[12]  That comprehensive opinion was intended to provide a record for future consideration of the many anticipated motions filed pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the underlying facts and conclusions of law in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.

Camargo-Simental seeks relief based on events that came to light in the *Black* case and investigation, which involved audio recordings of telephone conversations and soundless video recordings of meetings between attorneys and their clients who were detained at CCA.  The government admits that it obtained videos from CCA in connection with the *Black* case, which focused on drug and contraband trafficking inside CCA.  The government's possession of these recordings came to light in August 2016, when then-Special Assistant United States Attorney ("SAUSA") Erin Tomasic and AUSA Kim Flannigan accused defense attorney Jacquelyn

---

[9] Doc. 43.

[10] *Camargo-Simental*, No. 18-4122-JAR-JPO, Docs. 3, 4.

[11] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Mar. 19, 2021).

[12] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, the Sixth Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience, the Court refers to it as CCA in this Order.

Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to

have gleaned from the video recordings.[13]  The defense also discovered that the  United States

Attorney's Office for the District of Kansas ("USAO") had routinely obtained CCA recorded

attorney-client phone calls, and that it did so without notice to the attorneys, clients, or courts.[14]

Once notified of the video and audio recordings, this Court ordered (1) all local federal

detention facilities to cease recording attorney-client meetings and phone calls;[15] (2) the video

and audio recordings in USAO custody to be impounded;[16] and (3) the government to preserve

its computer hard drives.[17]  By October 11, 2016, the Court had appointed a Special Master to

assist in what the Court termed "Phase I and Phase II" of the Court's investigations, that is, to

determine the number of recordings possessed by the government and how to index and

segregate them, and to identify privileged or confidential information within those recordings.[18]

On January 31, 2017, the Special Master issued the "First Report Regarding Video

Recordings."[19]  The Special Master determined that the government had obtained from CCA

video recordings of the attorney-inmate rooms made between February 20, 2016, and May 16,

2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700

attorney visits.[20]  This Court in *Black* found that the USAO did not come into possession of the

---

[13] *Id.* at 70–80.

[14] *Id.* at 29–30.

[15] *Black*, Doc. 253 at 3.

[16] *Id.* at 3 & 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[17] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[18] *Black*, Doc. 146 (Appointment Order).

[19] *Black*, Doc. 193.

[20] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

CCA videos until June 1, 2016.[21]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[22]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[23]

The government did not cooperate with the Special Master's investigation, however, and its failure to cooperate ultimately resulted in a lengthy delay in this Court's ability to rule on these issues.  Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[24]  The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[25]  The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit

---

[21] *Black* Order at 66.

[22] *CCA Rec. Lit.*, Doc. 784 at 13.

[23] *Id.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[24] *Black* Order at 164–65.

[25] *Id.* at 145–63.

decision in *Shillinger v. Haworth*,[26] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[27]  Once those elements are established, prejudice is presumed.[28]

The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[29]  While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment.  With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[30]  This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[31]

---

[26] 70 F.3d 1132 (10th Cir. 1995).

[27] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[28] *Id.*

[29] *Id.* at 163.

[30] *Id.* at 165.

[31] *Id.* at 166.

C.      **Proceedings in Consolidated Master Case**

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[32]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

The Court also assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[33]  The government argues that many of the privilege logs fail this subjective test because (1) many of them do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not sufficient to establish privileged attorney-client communications are depicted on a soundless video.  The Court must review the recordings in

---

[32] *CCA Rec. Lit.*, Doc. 1.

[33] *Id.*, Doc. 21 at 50.

order to rule on these objections, and will do so on a case-by-case basis as needed.  There is no need for such particularized review in the instant case.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[34]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims with for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[35]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification

[34] *Id.*, Docs. 587, 588.

[35] *Id.*

requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[36]  Camargo-Simental timely filed a Signed Rule 2(b)(5) Verification on February 25, 2021.[37]

### D.    Recording in this Case

On August 13, 2019, this Court released the video recordings to the FPD as a result of the *Black* investigation.[38] The government received one video recording of Camargo-Simental meeting with Telthorst at CCA on April 29, 2016.  Camargo-Simental was prosecuted by AUSA Greg Hough, who stated in an affidavit that he was not aware of the video recordings of the meetings nor did he review them.[39]

Pursuant to the Court's Order, Camargo-Simental provided a privilege log detailing the claimed protected communication, verifying that during this meeting, Camargo-Simental discussed matters relating to legal advice and strategy with Telthorst.[40]  Camargo-Simental also provided a sworn declaration from Telthorst, stating that he reviewed the video recording listed on the privilege log, and confirmed, with respect to the recorded meeting and each other meeting with Camargo-Simental at CCA: (1) the only reason he met with Camargo-Simental "was to discuss matters related to legal advice or strategy; and (2) he had no knowledge nor did he believe that the meetings were recorded as they were attorney-client protected, that he did not consent to such, and that he was not aware such recordings would be dispensed to prosecutors.[41]

---

[36] *Id.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[37] *Id.*, Doc. 775.

[38] *Black* Order at 165.  The FPD took possession of the DVR hard drives on August 16, 2019. *Black*, Doc. 761.

[39] *Camargo-Simental*, No. 18-4122-JAR-JPO, Doc. 3-1.

[40] *CCA Rec. Lit.*, Doc. 205-2 at 27.

[41] *Camargo-Simental*, No. 18-4122-JAR-JPO, Doc. 4-1.

The privilege log indicates that Telthorst and Camargo-Simental discussed sentencing enhancement and potential methods to reduce her sentence.

The Court reviewed the video recordings *in camera*. As set out in the privilege log, the Court confirms that the video recordings show Camargo-Simental meeting with Telthorst and an interpreter for nearly an hour. In light of the analysis below, however, the details of the meeting visible in the video are not pertinent and will not be discussed in this order.

## II.    Discussion

The government argues that Camargo-Simental lacks standing to challenge her conviction.

### A.    Justiciability Standards

Article III of the Constitution gives federal courts the power to exercise jurisdiction only over "Cases" and "Controversies." Federal courts must have a statutory or constitutional basis to exercise jurisdiction.[42] And, without jurisdiction, a court must dismiss the case.[43] Courts thus must determine, either *sua sponte* or upon a challenge by a party "at any stage in the litigation," whether subject matter jurisdiction exists.[44]

There are three basic elements of standing: (1) an injury, (2) a causal connection between that injury and conduct complained of in motion, and (3) the likelihood that court action could redress that injury.[45] To demonstrate causation, a party must show that their alleged injury is

---

[42] *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

[43] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[44] *Arbaugh*, 546 U.S. at 506 (explaining that challenges to subject matter jurisdiction "may be raised . . . at any stage in the litigation, even after trial and the entry of judgment.").

[45] *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 2021 WL 850106, at *2 (Mar. 8, 2021).

"fairly traceable" to the complained of conduct.[46]  "Article III . . . require[s] proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."[47]  "When '[s]peculative inferences are necessary to connect [a plaintiff's] injury to the challenged action,' this burden has not been met."[48]

> B.      Timing of the Alleged Violation

The recorded conversation between Camargo-Simental and Telthorst took place on April 29, 2016, after she entered her guilty plea on June 1, 2015, and before she was sentenced on May 23, 2016.  As noted above, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.  Thus, any alleged Sixth Amendment violation could not have occurred until after Camargo-Simental entered a guilty plea, leaving no redressable injury.

As this Court discussed in its January 18, 2021 Order, when the alleged intrusion occurs after the petitioner entered a guilty plea, "the intrusion cannot be tied to any claimed unfairness or impropriety in the plea . . . .  Without such a nexus, these petitioners cannot proceed with claims challenging  . . . their convictions."[49]  Camargo-Simental cannot demonstrate an injury or any nexus between an injury and the USAO's conduct, and thereby cannot satisfy the minimal requirements for standing to challenge her conviction.  Although the alleged violation occurred prior to sentencing, Camargo-Simental has completed her term of supervised release and does

---

[46] *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008) (*citing Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)).

[47] *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th 2005) (citations omitted).

[48] *Id.* at 1157 (*quoting Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45–46 (1976)).

[49] *See CCA Rec. Lit.*, Doc. 730 at 53.

not challenge her sentence, including her term of supervised release.[50]  The Court concludes that Camargo-Simental lacks standing to challenge her conviction and her § 2255 motion must be dismissed for lack of jurisdiction.[51]

## III.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[52]  If the district court denies a habeas petition on procedural grounds without reaching the merits of petitioner's underlying constitutional claim, "the prisoner must show both (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling' *and* (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"[53]  For the reasons explained above, Petitioner has not met either showing and the Court therefore denies a COA.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Tomasa Camargo-Simental's Motion to Vacate and Discharge with Prejudice under 28 U.S.C. 2255 (Doc. 43) is **dismissed**.  Camargo-Simental is also denied a certificate of appealability.

---

[50] As discussed in its January 18, 2021 Order, a petitioner's removal from the United States following the end of her custodial sentence renders her § 2255 challenge to her sentence moot, including any term of supervised release.  *See id.* at 46–49 (citing *United States v. Vera-Flores*, 496 F.3d 1177, 1181–82 (10th Cir. 2007)).

[51] Because this lack of standing provides a sufficient basis to dismiss Camargo-Simental's § 2255 motion, the Court does not address the government's other arguments regarding timeliness under 2255(f)(4).  The Court further notes that Camargo-Simental's § 2255 motion is subject to dismissal for failure to comply with the Court's order to provide the government verified responses to government interrogatories, in compliance with Fed. R. Civ. P. 33(b)(5).  *See CCA Rec. Lit.*, Docs. 799, 806.

[52] 28 U.S.C. § 2253(c)(2).

[53] *United States v. Park*, 727 F. App'x 526, 528 (10th Cir. 2018) (emphasis in original) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

**IT IS SO ORDERED.**

Dated: <u>March 23, 2021</u>

                              <u>S/ Julie A. Robinson</u>
                             JULIE A. ROBINSON
                             CHIEF UNITED STATES DISTRICT JUDGE